IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| NEBRASKA BEEF PRODUCERS COMMITTEE,<br><br>               Plaintiff,<br><br>vs.<br><br>NEBRASKA BRAND COMMITTEE and WILLIAM BUNCE, in his official capacity as Executive Director of the Nebraska Brand Committee,<br><br>               Defendants. | 4:17-CV-3061<br><br>MEMORANDUM AND ORDER |

At issue in this case is the constitutionality of the Nebraska Livestock Brand Act, Neb. Rev. Stat. §§ 54-170 to 54-1,127 (Reissue 2010, Cum. Supp. 2016, & Supp. 2017). The Nebraska Beef Producers Committee (Beef Producers) sued the Nebraska Brand Committee and its executive director, William Bunce (collectively, the Brand Committee), alleging that the Brand Act violates the dormant Commerce Clause and Equal Protection Clause of the Constitution. The Court finds no merit to those allegations, and will dismiss the Beef Producers' complaint.

The Court does not doubt that the Beef Producers sincerely believe the Brand Act has outlived its usefulness. But the people who can help them with that problem, if indeed it is a problem, can be found about 4 blocks south down Centennial Mall. Whatever flaws there might be with the Brand Act, it does not violate federal law.

# I. BACKGROUND

The Brand Act, originally enacted in 1941,[1] aims to detect and prevent livestock theft by establishing a regime for recording livestock brands and inspecting livestock—particularly cattle—to ensure proper ownership. *See* 1941 Neb. Laws, ch. 111, § 9, p. 437. At the time, brand inspection had been carried on for 20 years by the Nebraska Stock Growers Association, and the Legislature enacted the Brand Act to create the Brand Committee and invest it with authority to enforce the brand laws. Statement, L.B. 275, Agriculture Committee, 55th Leg. (Mar. 5, 1941). The enactment was endorsed by the Nebraska Stock Growers Association, Omaha Live Stock Exchange, and the Sales Ring Association. *Id.*

The Brand Act created the Brand Committee, whose voting members are appointed by the Governor—at least three voting members must be active cattlepersons, and one must be an active cattle feeder. § 51-191. Among other things, the Brand Committee is responsible for recording brands and publishing a book of all recorded brands. § 54-193; *see* § 54-199.

Brands are means of identifying livestock. *See* § 54-199. A "visual brand" is "a mark consisting of symbols, characters, numerals, or a combination of such intended as a visual means of identification," marked on the hide of a live animal by applying either a hot iron or intense cold. *See* § 54-198 & 54-199(2); *see also* § 54-181. The Brand Committee may also provide for recording and use of electronic brands or other nonvisual methods of livestock identification, if they function as well as or better than visual brands. § 54-199(4). It is generally unlawful to use a brand in Nebraska that

---

[1] The Brand Act was technically repealed and reenacted in 1999, but that was to "update[], simplif[y], and clarif[y]" the Brand Act, "making no substantive changes." Committee Statement, L.B. 778, Agriculture Committee, 96th Leg., 1st Sess. (Mar. 9, 1999).

has not been recorded with the Brand Committee. § 54-198; *but see* §§ 54-186.01 & 54-1,128 (permitting one-time use of out-of-state brand on cattle to be exported). And a recorded brand is *prima facie* evidence of livestock ownership, admissible in court if the brand is properly recorded. § 54-1,107.

The purpose of the Brand Committee is "to protect Nebraska brand and livestock owners from the theft of livestock through established brand recording, brand inspection, and livestock theft investigation." § 51-191. The Brand Act authorizes a fee of not more than $1.10 per head to be charged for cattle inspection. § 54-1,108. And the Brand Act creates a "brand inspection area" made up of, essentially, the western two-thirds of Nebraska. §§ 54-175 & 54-1,109; *see* filing 1-1. Livestock in the brand inspection area, or moving in or out of the brand inspection area, are subject to special requirements.

It is unlawful to move cattle out of the brand inspection area unless a brand inspection is performed. § 54-1-110(1); *see* 54-179; *but see* § 54-1,110(3) (authorizing issuance of permit to landowners whose property straddles the border of the brand inspection area). With limited exceptions, it is unlawful to sell or trade cattle within the brand inspection area unless the cattle have been inspected for brands. § 54-1,111. Anyone in the brand inspection area who slaughters cattle must keep a record of cattle purchased and slaughtered, and anyone who purchases cattle hides must keep a record of the hides. § 54-1,112. Inside the brand inspection area, it is unlawful to sell or trade a beef or veal carcass, including the hide, without a certificate of inspection from a brand inspector. § 54-1,113(1)(a). And outside the brand inspection area, it is unlawful for anyone but a bonded butcher to sell a beef or veal carcass without showing the buyer the intact hide and the brand. § 54,1113(1)(b).

It is also unlawful to transport livestock or carcasses by motor vehicle on a public road in the brand inspection area without a livestock transportation permit from the owner of the livestock, a certificate of inspection, or a shipping certificate from a registered feedlot. § 54-1,115. No cattle may be sold or otherwise disposed of without a certificate of inspection. § 54-1,116. And no livestock in, entering into, or passing through the brand inspection area are allowed to intermingle with other livestock after they have been inspected. § 54-1,117.

It is also generally unlawful for a butcher, meatpacker or vendor slaughtering cattle in the brand inspection area to kill or dispose of cattle until a brand inspection is performed and a certificate of inspection is issued, § 54-1,114(1). But if cattle are purchased by a butcher, meatpacker, or vendor at a regularly brand-inspected sales barn and are destined for direct slaughter, the brand inspector at the sales barn may issue a certificate of inspection permitting the cattle to be slaughtered within 96 hours of receipt. § 54-1,114(2).

Notably, however, a cattle feeding operation in the brand inspection area may apply to the Brand Committee to become a "registered feedlot." § 54-1,120(1). The Brand Act authorizes the Brand Committee to charge a registration fee for each 1,000 head the feedlot maintains,[2] with the fee to be proportional to the per-head brand inspection fee. § 54-1,120(1). Registered feedlots may be inspected by the Brand Committee at any reasonable time, and must produce cattle purchase records or certificates of inspection for all the cattle at the feedlot upon demand. § 54-1,120(3).

---

[2] The initial fee is based on the facility's capacity, while the annual renewal fee is based on the facility's average annual inventory. § 54-1,120(1).

Cattle in a registered feedlot are not subject to brand inspection when they are moved from the brand inspection area. § 54-1,110(2); *see* §§ 54-188 & 54-1,120. Brand inspection is not required for cattle bought in the brand inspection area that are shipped from a registered feedlot for direct slaughter, or for sale to a terminal market. § 54-1,111(2)(a). And cattle shipped from a registered feedlot are not subject to brand inspection at origin or destination if they are destined for direct slaughter or sale at a terminal market, but the shipper must have a shipping certificate from the registered feedlot. § 54-1,121. Cattle shipped from a registered feedlot for any purpose other than direct slaughter or sale at a terminal market are, however, subject to brand inspection. § 54-1,121.

In addition, cattle coming from another state that has a brand inspection agency, and that have a certificate of inspection or brand clearance from that agency, may be moved directly from their point of origin to a registered feedlot. § 54-1,122. But any cattle that do not have a certificate of inspection or brand clearance, or that do not have satisfactory evidence of ownership from an area not having brand inspection, must be inspected by the Brand Committee after arriving at the registered feedlot. § 54-1,122.

And a livestock market or meatpacking plant which maintains brand inspection supervised by the Brand Committee may be designated by the Brand Committee as an "open market," meaning that when cattle in the brand inspection area are consigned for sale at the open market, brand inspection is not required at the point of origin, but is required at the point of destination unless the point of origin is a registered feedlot. §§ 54,1,119(1) & (2). (In other words, cattle from a registered feedlot consigned for sale at an open market need not undergo a brand inspection.)

The upshot of the statutory scheme is that, generally, cattle moving in or out of the brand inspection area or being sold, traded, or slaughtered in the brand inspection area are subject to inspection. But cattle shipped to or from a registered feedlot are (depending somewhat on the origin or destination of the cattle) exempt from many of those requirements. And either having cattle inspected, or registering a feedlot to reduce inspection requirements, means paying a fee to the Brand Committee.

The Beef Producers allege that they are "a non-profit, mutual benefit corporation" whose "members include cattle producers operating registered feedlots within Nebraska." Filing 1 at 1-2. As noted above, the Beef Producers claim that the Brand Act runs afoul of both the dormant Commerce Clause and the Equal Protection Clause, to the detriment of their members, and they move to preliminarily and permanently enjoin the Brand Act's enforcement on those grounds. Filing 1; filing 6. The Brand Committee moves to dismiss the Beef Producers' claims. Filing 16.

## II. DISCUSSION

The Brand Committee moves to dismiss the Beef Producers' claims on their merits for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). But first, they move to dismiss the case for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1).

### 1. SUBJECT MATTER JURISDICTION

The Brand Committee presents several jurisdictional arguments: it argues that the Beef Producers' claims are barred by sovereign immunity, and that the Beef Producers lack standing both because they have not alleged

a redressable injury-in-fact caused by the Brand Committee, and because they lack associational standing.[3]

### (a) Standard of Review

A motion pursuant to Rule 12(b)(1) challenges whether the court has subject matter jurisdiction. The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010).

A court deciding a motion under Rule 12(b)(1) must distinguish between a "facial attack"' and a "factual attack." *Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015). In a facial attack, the Court merely needs to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction. *Id.* The Brand Committee's jurisdictional arguments are focused on purported deficiencies in the Beef Producers' pleadings, presenting a facial attack. Accordingly, the Court restricts itself to the face of the pleadings, and the Beef Producers receive the same protections as they would defending against a motion brought under Rule 12(b)(6)—that is, the Court accepts all factual allegations in the pleadings as true and views them in the light most favorable to the Beef Producers. *Id.*; *Hastings v. Wilson*, 516 F.3d 1055, 1058 (8th Cir. 2008).

### (b) Sovereign Immunity

The Brand Committee argues that the Beef Producers' suit is barred by sovereign immunity, because "a state is not a person within the meaning of

---

[3] While the Court will explain below why the Beef Producers' complaint fails to state a claim for relief, the Court is nonetheless obliged to first consider the Brand Committee's jurisdictional arguments. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998); *Wong v. Wells Fargo Bank N.A.*, 789 F.3d 889, 895 (8th Cir. 2015).

[42 U.S.C.] § 1983." Filing 17 at 20 (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989)). This is a surprising argument, though, because the only relief sought by the Beef Producers is injunctive, and it is long-established that a federal court may command a state official to refrain from violating federal law. *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011); *Ex parte Young*, 209 U.S. 123, 159 (1908).

In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (cleaned up). Here, no liability of the state or the executive director is at issue, and the complaint does not seek money damages from the state based on a past breach of legal duty on the part of the defendants. *See id.* at 646. Instead, the Beef Producers seek declaratory and injunctive relief, alleging that the Brand Act violates the Constitution— clearly satisfying the Court's "straightforward inquiry." *See id.* at 645.

It is true that under the *Ex parte Young* doctrine, there is a distinction between the executive director in his official capacity and the Brand Committee itself. The Beef Producers admit that the Brand Committee is a state agency. Filing 1 at 2. And while state officials may be sued in their official capacities without violating the Eleventh Amendment, the same doctrine does not extend to states or state agencies. *Monroe v. Arkansas State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007); *see Alabama v. Pugh*, 438 U.S. 781, 782 (1978). Accordingly, the Beef Producers cannot proceed against the Brand Committee for injunctive relief. *Monroe*, 495 F.3d at 594.

So, the Brand Committee's motion to dismiss will be granted on those grounds to that extent. But the Brand Committee's motion to dismiss argues for dismissal, not just of the Brand Committee as distinguished from the executive director, but for dismissal of the entire complaint on the basis of sovereign immunity. Filing 17 at 19-20. So, the Court rejects the balance of the Brand Committee's sovereign immunity argument.

### (c) Standing

As noted above, the Brand Committee makes two distinct standing arguments: (i) lack of a redressable injury-in-fact caused by the Brand Committee and (ii) lack of associational standing.

### *(i) Injury-in-Fact*

The irreducible constitutional minimum of standing contains three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Id.* Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Id.* Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 561.

The party invoking federal jurisdiction bears the burden of establishing these elements. *Id.* But at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss the Court presumes that general allegations embrace those specific facts that are necessary to support the claim. *Id.*

The Brand Committee claims that the Beef Producers have not alleged enough to establish *any* of the three elements of standing. Filing 17 at 21-24. But the Beef Producers' allegations are obviously sufficient. If nothing else, the Beef Producers allege that the Brand Act requires cattle producers to pay brand inspection fees or registered feedlot permit fees. Filing 1 at 8-9. That easily calculable out-of-pocket amount is just about as "concrete" and "particularized" as injuries get.[4] *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury'"); *accord Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 693 (8th Cir. 2017); *see United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).

Furthermore, when a state or local law imposes compliance burdens on those it regulates or controls, and compliance is coerced by the threat of enforcement, the controversy is both immediate and real. *Keller v. City of Fremont*, 719 F.3d 931, 947 (8th Cir. 2013). And it is equally evident that those fees and regulatory burdens are traceable to the Brand Committee's enforcement of the Brand Act, and that enjoining that enforcement would redress the injury. *See Wieland v. U.S. Dep't of Health & Human Servs.*, 793 F.3d 949, 954-56 (8th Cir. 2015); *see also Calzone v. Hawley*, 866 F.3d 866, 870 (8th Cir. 2017).

The Brand Committee focuses its attention on the Beef Producers' allegation that delays occasioned by brand inspection can cause cattle to lose

---

[4] The Brand Committee charges $1 per head for brand inspection, and charges $1,000 for a registered feedlot permit for each 1,000 head capacity, plus $250 for each additional 250 head capacity. Nebraska Brand Committee, *Fee Schedule*, http://nbc.nebraska.gov/fees (last visited February 5, 2018).

weight, reducing profits. Filing 17 at 23; *see* filing 1 at 5. That allegation is more speculative, and less concrete—but, despite the attention it receives from the Brand Committee, it is not the only allegation in the complaint. When the complaint is read in its entirety, it clearly alleges an injury in fact, caused by the Brand Committee, and redressable by the Court.

### (ii) Associational Standing

The Brand Committee also questions the Beef Producers' associational standing. Associational standing is the doctrine by which, "even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1128 (8th Cir. 2016) (cleaned up). Specifically, an association like the Beef Producers may have standing to bring suit on behalf of its members, if (a) its members would otherwise have standing to sue in their own right, (b) the interests at stake are germane to the organization's purpose, and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *Am. Farm Bureau Fed'n v. U.S. Envtl. Prot. Agency*, 836 F.3d 963, 968 (8th Cir. 2016). The Brand Committee challenges each element.

### a. Member Standing

First, the Brand Committee claims that the Beef Producers have not alleged enough to show that members of the Beef Producers would have standing to sue in their own right. Filing 17 at 24-25. The Court disagrees. The Beef Producers "need not establish that all of [their] members would have standing to sue individually so long as [they] can show that any one of them would have standing." *Iowa League of Cities v. E.P.A.*, 711 F.3d 844,

869 (8th Cir. 2013) (quotation omitted) (citing *Warth v. Seldin,* 422 U.S. 490, 511 (1975)). The Beef Producers specifically allege how the Brand Act affects their members, including the fees that establish an injury in fact.

In other words, the injured parties are not merely "constituents" of the Beef Producers; they are actual members. *See Missouri Prot. & Advocacy Servs., Inc. v. Carnahan,* 499 F.3d 803, 809-10 (8th Cir. 2007). And an association seeking relief is deemed to have a sufficient stake in the outcome when it alleges that some of its members have in fact been injured. *Middlewest Motor Freight Bureau v. United States,* 525 F.2d 681, 683 (8th Cir. 1975). The Beef Producers' allegations of how some Nebraska cattle producers have been injured are "direct and sufficient to establish the requisite 'case or controversy'" between the Beef Producers and the Brand Committee. *See Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 333, 343-44 (1977).

### b. Germaneness

The Brand Association complains that the Beef Producers do not specifically allege the purpose of their organization in the complaint. Filing 17 at 25. To be sure, it would be better if they had. But it is not difficult for the Court to infer that the "Nebraska Beef Producers Committee," "a non-profit, mutual benefit corporation[,]" is generally engaged in representing the interests of Nebraska beef producers. *See* filing 1 at 1. Such trade associations are, in fact, the sort of organization that is typically permitted to assert associational standing. *See Hunt,* 432 U.S. at 342.

### c. Member Participation

Finally, the Brand Committee argues that the Beef Producers' members would be required to participate in the lawsuit individually,

because "[t]he inquiry into whether the Brand Act either violates the Dormant Commerce Clause or the Equal Protection Clause would necessarily require the Court to look to how the [Brand] Act has impacted the members of the [Beef Producers]" and the Commerce Clause claim "puts into the question of whether the Brand Act has had any impact on the interstate commerce activities of [Beef Producers] members." Filing 17 at 26.

But the Brand Committee misunderstands this element of the test for associational standing. The Supreme Court has expressly explained that if an association "seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515. It is only when an association seeks relief in damages for alleged injuries to its members, or other relief that must be specifically tailored to the individual injury of a member, that an individual member's participation may be required. *Compare Hunt*, 432 U.S. at 344, *and Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 533 (8th Cir. 2005), *with Warth*, 422 U.S. at 516, *and Missouri Prot. & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 810 (8th Cir. 2007).

Were this case to proceed, it might be necessary for individual members of the Beef Producers to participate as *witnesses*, but it would not be necessary for them to participate as *parties*—and that is all that associational standing requires.

### (d) Conclusion

In sum, the Court finds that sovereign immunity does not require dismissal of the Beef Producers' complaint, and that the Beef Producers have standing to assert their claims. Accordingly, the Court will consider whether those claims have merit.

## 2. DORMANT COMMERCE CLAUSE

The Commerce Clause of the Constitution gives Congress the power "to regulate commerce . . . among the several states . . . ." U.S. Const. art. I, § 8. But although the Commerce Clause is framed as a positive grant of power to Congress, it contains a further, negative command, known as the dormant Commerce Clause. *Comptroller of Treasury of Maryland v. Wynne*, 135 S. Ct. 1787, 1794 (2015). "By prohibiting States from discriminating against or imposing excessive burdens on interstate commerce without congressional approval, it strikes at one of the chief evils that led to the adoption of the Constitution, namely, state tariffs and other laws that burdened interstate commerce." *Id.*

The dormant Commerce Clause precludes states from discriminating between transactions on the basis of some interstate element. *Id.* A discriminatory law is virtually *per se* invalid, and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008). But it does not appear that the Beef Producers argue that the Brand Act is discriminatory. *See* filing 20 at 7-9.

Instead, the Beef Producers argue that the Brand Act burdens interstate commerce. *See* filing 20 at 7-9. They rely on the test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), which is intended for laws directed to legitimate local concerns, with incidental effects upon interstate commerce. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007). Under that test, the law will be upheld unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits. *Id.*; *see Davis*, 553 U.S. at 338. If a legitimate local purpose is found, then the question becomes one of degree,

and the extent of the burden that will be tolerated depends on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 441-42 (1978); *Pike*, 397 U.S. at 142.

So far as the Court can discern, the Beef Producers do not contend that there is *no* legitimate local purpose for the Brand Act. *See* filing 20 at 7-9. And, in fact, the legitimate purpose of such regulations is well-established. *See Territory of New Mexico ex rel. E. J. McLean & Co. v. Denver & R. G. R. Co.*, 203 U.S. 38, 53-54 (1906). So, it is a question of degree. The Beef Producers contend that "the original benefits of the Brand Act have been rendered obsolete by evolution of the cattle industry[,]" reducing the risk of theft to the point that the burdens imposed by the Brand Act are no longer justified. Filing 20 at 8.

But what the Beef Producers primarily allege are burdens on *them*, not on interstate commerce. They connect those burdens to interstate commerce by alleging that they routinely purchase cattle inside and outside of the brand inspection area, purchase cattle from other states, and sell to meat processing facilities in neighboring states. Filing 1 at 10; filing 20 at 7-8. In other words, they are complaining, not about burdens on interstate commerce, but burdens on Nebraska businesses that happen to buy or sell in interstate commerce.

Those allegations suggest that the Brand Act "affects the flow of interstate commerce but it does not burden interstate commerce." *Hampton Feedlot, Inc. v. Nixon*, 249 F.3d 814, 819 (8th Cir. 2001). After all, the Brand Act has existed since 1941, yet the Beef Producers are specifically alleging their current, extensive involvement in interstate commerce. The fees and obligations the Brand Act imposes are, rather, "neutral" and "locally focused."

*See Am. Trucking Associations, Inc. v. Michigan Pub. Serv. Comm'n*, 545 U.S. 429, 434 (2005). The Supreme Court has explained that states often impose fees on local businesses and service providers, and while a state tax affecting interstate commerce is not "immune from Commerce Clause scrutiny because it attaches only to a local or intrastate activity," it is clear that "the Constitution neither displaces States' authority to shelter their people from menaces to their health or safety, nor unduly curtails States' power to lay taxes for the support of state government." *Id.* (cleaned up). The Brand Act, an exercise of police power intended to detect crime and protect citizens' property, is no different.

The Commerce Clause presumes a national market free from local legislation that discriminates in favor of local interests. *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 393 (1994). It is, accordingly, important to remember that the incidental burdens to which *Pike* refers are the burdens on interstate commerce that exceed the burdens on intrastate commerce. *Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326, 336 (5th Cir. 2007); *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 217 (2d Cir. 2004); *see Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 472-73 (1981); *see also United Haulers*, 550 U.S. at 346. "[L]egislation will not be invalidated under the *Pike* test unless it imposes *discriminatory* burdens on interstate commerce." *Old Bridge Chemicals, Inc. v. New Jersey Dep't of Envtl. Prot.*, 965 F.2d 1287, 1295 (3d Cir. 1992).

Thus, a Commerce Clause challenge to a state regulation requires showing that the regulation has a disparate impact on interstate commerce—the fact that it may otherwise affect commerce is not sufficient. *Spitzer*, 357 F.3d at 217-18. Where a regulation does not have this disparate effect on interstate commerce, then it has not imposed any incidental burdens on

interstate commerce that are clearly excessive in relation to the putative local benefits. *See id.*; *Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1015 (9th Cir. 1994); *see also Grand River Enters Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 942-43 (8th Cir. 2009) (citing *Spitzer*, 357 F.3d at 219).

For instance, state regulations subject to Commerce Clause scrutiny include those that disrupt travel and shipping due to a lack of uniformity in state laws, affect commerce beyond the borders of the defendant state, or have impacts that fall more heavily on out-of-state interests. *Smitch*, 20 F.3d at 1015. But the Beef Producers allege no such effects. They have, in fact, not identified "any in-state commercial interest that is favored, directly or indirectly . . . at the expense of out-of-state competitors[,]" *Spitzer*, 357 F.3d at 219—which is not surprising, because *they* represent the in-state commercial interests most affected by the Brand Act. There is no reason to believe, from the Beef Producers' allegations, that in-state interests gain, or out-of-state interests lose, from the Brand Act's enforcement. *See Clover Leaf Creamery*, 449 U.S. at 472-73.

And even if some burden on interstate commerce had been established, that burden would be warranted by the putative local benefits. The nature of the local interest involved—the detection and prevention of livestock theft—is plainly an exercise of the police power on a matter of traditionally local concern. *See United Haulers*, 550 U.S. at 347; *Kassel v. Consol. Freightways Corp. of Delaware*, 450 U.S. 662, 670-71 (1981). And while the Beef Producers have alleged that livestock theft is not the problem it once might have been, due to changes and improvements in security measures and cattle production facilities, filing 1 at 6-7, they do not allege—nor, indeed, could they allege—

that the risk of livestock theft has been wholly eliminated.[5] *E.g.*, *State v. Miner*, No. A-02-933, 2004 WL 1091996 (Neb. Ct. App. May 18, 2004) (affirming criminal conviction resulting from Brand Committee investigation of cattle theft).

Even if the Beef Producers are given the benefit of their allegation that the purposes of the Brand Act could be achieved with some sort of voluntary inspection regime, filing 1 at 10-11, they have not alleged facts sufficient to support a conclusion that any burden imposed on interstate commerce is "*clearly* excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142 (emphasis supplied). While the Beef Producers allege that the Brand Act has become "ineffectual and obsolete," filing 1 at 6, the facts they allege indicate at least some effect. For instance, while the 910 head of cattle recovered in 2016-17 might be a 60 percent drop from 2007-08, that's still 910 head of cattle. *See* filing 1 at 7. Weighing the significance of those cattle, and other considerations such as the possible deterrent effect of the Brand Act on cattle theft, against the burdens imposed on Nebraska cattle producers, is the sort of paradigmatically legislative judgment that should not be made by the federal judiciary in the guise of a constitutional question. *See United Haulers*, 550 U.S. at 344-45, 347.

In sum, the Brand Act is local regulation, on a matter of local concern, that does not burden interstate commerce. Its enforcement is not precluded by the dormant Commerce Clause.

---

[5] The Beef Producers' argument also poses the question whether cattle theft is less prevalent, at least in part, *because* of the Brand Act. *Cf. Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612, 2638 (2013) (Ginsberg, J., dissenting). While the Beef Producers note a decline in the number of lost or stolen cattle recovered, filing 1 at 7, there is no real way to ascertain the Brand Act's deterrent effect.

### 3. EQUAL PROTECTION CLAUSE

The Beef Producers also contend that the Brand Act violates the Equal Protection Clause. Filing 1 at 11. Specifically, they challenge the existence of the brand inspection area, and claim that the Brand Act denies equal protection by treating the roughly two-thirds of Nebraska in the brand inspection area differently from the rest of the state. Filing 1 at 11.

But, as the Brand Committee points out, filing 17 at 37-40, the Equal Protection Clause does not prohibit such distinctions. The Equal Protection Clause is essentially a direction that all persons similarly situated should be treated alike. *Schmidt v. Ramsey*, 860 F.3d 1038, 1047 (8th Cir.), *cert. denied sub nom. S.S. ex rel. Schmidt v. Bellevue Med. Ctr. L.L.C.*, 138 S. Ct. 506 (2017). It has long been held, however, that the Equal Protection Clause does not reach geographic distinctions. *See Reeder v. Kansas City Bd. of Police Comm'rs*, 796 F.2d 1050, 1053 (8th Cir. 1986). Instead, the Equal Protection Clause relates to equality between persons as such, rather than between areas, and territorial uniformity is not a constitutional prerequisite. *McGowan v. State of Md.*, 366 U.S. 420, 427 (1961); *see Griffin v. Cty. Sch. Bd. of Prince Edward Cty.*, 377 U.S. 218, 230 (1964); *Salsburg v. State of Md.*, 346 U.S. 545, 552 (1954).

> [W]hen the state chooses to regulate differentially, with the laws falling unequally on different geographic areas of the state, the Equal Protection Clause is not violated so long as there is no underlying discrimination against particular persons or groups. The Equal Protection Clause protects people, not places. So long as all persons within the jurisdictional reach of the statute are equally affected by the law, it matters not that those outside the territorial reach of the law are free to behave differently.

*Reeder*, 796 F.2d at 1053 (citation omitted); *accord von Kerssenbrock-Praschma v. Saunders*, 121 F.3d 373, 378 n.3 (8th Cir. 1997); *see Cent. Lumber Co. v. State of S. Dakota*, 226 U.S. 157, 160-61 (1912).

> It is no requirement of equal protection that all evils of the same genus be eradicated or none at all. Nor . . . must the agency choose between attacking every aspect of a problem or not attacking the problem at all. . . . Moreover, the government's regulation of a known evil at one place does not become invalid by the discovery of a similar, as-yet-unregulated evil at another.

*State of La., ex rel. Guste v. Verity*, 853 F.2d 322, 333 (5th Cir. 1988) (quotation omitted). In other words, "reasonable territorial distinctions are within the discretion of the legislature." *Reeder*, 796 F.2d at 1054. The state may "give the law its maximum territorial effect" or "restrict its operation to the locality thought to be most in need of it." *Id.* at 1055.

In this case, the brand inspection area, as described by the Nebraska Supreme Court, "represents the cattle and range area of Nebraska." *Satterfield v. State*, 109 N.W.2d 415, 417 (Neb. 1961). "As such, it can be readily distinguished from the rest of the state." *Id.* And based on such reasoning, inspection areas of the kind at issue here have been upheld against Equal Protection challenges. *Id.* at 417-18; *see Black Hills Packing Co. v. S.D. Stockgrowers Ass'n*, 397 F. Supp. 622, 629 (D.S.D. 1975); *State v. Smith*, 216 N.W.2d 149, 151 (S.D. 1974). It was well within the legislature's discretion to limit application of the Brand Act to the brand inspection area.

Furthermore, even if the brand inspection area is subjected to constitutional scrutiny, it easily passes. If a law neither burdens a fundamental right nor targets a suspect class, the Court will uphold the

legislative classification so long as it bears a rational relation to some legitimate end. *Schmidt*, 860 F.3d at 1047. The Beef Producers have alleged neither a fundamental right nor a suspect classification here, so the rational-basis test is appropriate. *See Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 680 (2012); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 813 (1976); *Schmidt*, 860 F.3d at 1047-48.

And under that test, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation. *Clover Leaf Creamery*, 449 U.S. at 469.

> States are not required to convince the courts of the correctness of their legislative judgments. Rather, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.

*Id.* at 463 (quotation omitted). Rational basis review requires deference to reasonable underlying legislative judgments. *Armour*, 566 U.S. at 680.

So, where a social or economic policy is challenged on equal protection grounds and no fundamental constitutional right has been infringed, the challenger must negate every conceivable basis which might support the legislation. *Grand River Enterprises Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 944 (8th Cir. 2009); *see Armour*, 566 U.S. at 680. And there is a plausible policy reason for the classification if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. *Armour*, 566 U.S. at 680. It is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment. *Kansas*

*City Taxi Cab Drivers Ass'n, LLC v. City of Kansas City, Mo.*, 742 F.3d 807, 810 (8th Cir. 2013).

Here, the Beef Producers allege that classifying feedlots based on their location is "arbitrary and unreasonable" because, they say, cattle in the brand inspection area "are no longer more vulnerable to theft than cattle raised in feedlots outside" the brand inspection area. Filing 1 at 11. They do not argue that the Brand Act was irrational when enacted, instead arguing that it has "outlived its usefulness." *See Schmidt*, 860 F.3d at 1048. But the Court's inquiry "is not whether the Act is necessary or even prudent;" the Court asks "simply whether it is rational." *Id.* The brand inspection area plainly is: it focuses the inspection regime of the Brand Act on the area where the activity to be regulated is most prevalent.

States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). A statutory classification impinging upon no fundamental interest, and especially one dealing only with economic matters, need not be drawn so as to fit with precision the legitimate purposes animating it. *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 813 (1976). That the legislature might have furthered its underlying purpose more artfully, more directly, or more completely, does not warrant a conclusion that the method it chose is unconstitutional. *Id.* Whatever the limitations of the brand inspection area might be, the designation of that area for greater scrutiny of livestock brands was not wholly arbitrary. The brand inspection area satisfies constitutional scrutiny.

### III. CONCLUSION

The Beef Producers have failed to state a claim upon which relief may be granted. Their questions about the efficacy and continued utility of the Brand Act might or might not be well-taken—but they are legislative questions, not constitutional ones. As the Supreme Court has explained, "when the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected." *United Haulers*, 550 U.S. at 345 (quotation omitted). But here, the citizens and businesses of Nebraska bear the costs of the Brand Act, and it is up to them and their representatives to decide, through the political process, whether the benefits of the Brand Act outweigh those costs. *See id.* The Court will grant the Brand Committee's motion to dismiss.

IT IS ORDERED:

1.   The Brand Committee's motion to dismiss (filing 16) is granted.

2.   The Beef Producers' complaint is dismissed.

3.   A separate judgment will be entered.

4.   The Beef Producers' motion for preliminary injunction (filing 6) is denied as moot.

Dated this 5th day of February, 2018.

BY THE COURT:

John M. Gerrard
United States District Judge